**BECKER & POLIAKOFF LLP**
Helen Davis Chaitman
HCHAITMAN@BECKER-POLIAKOFF.COM
45 Broadway
New York, New York 10006
Telephone (212) 599-3322

*Attorneys for Defendants Listed on Exhibit A to the
Chaitman Declaration*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>Defendant. | Adv. Pro. No. 08-1789 (BRL)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>Plaintiff,<br><br>v.<br><br>JAMES GREIFF et al. [1]<br><br>Defendant. | Adv. Pro. No. 10-04357 (BRL) |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR MANDATORY WITHDRAWAL OF THE REFERENCE

---

[1] This motion is filed by Becker & Poliakoff LLP on behalf of 313 defendants in 108 clawback actions filed by Irving H. Picard, Trustee, as listed on Exhibit A to the June 2, 2011 Declaration of Helen Davis Chaitman.

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1

PRELIMINARY STATEMENT ............................................................................. 1

ARGUMENT ............................................................................................................ 4

I.     WITHDRAWAL OF THE REFERENCE IS MANDATORY ......................... 4

     A.     THE CLAWBACK COMPLAINTS VIOLATE SIPA § 78FFF-2(C)(3) ...............6

     B.     THE COMPLAINTS VIOLATE OTHER SECURITIES LAWS........................10

     C.     THE TRUSTEE'S FINANCIAL STAKE IN HIS QUASI-GOVERNMENTAL DECISIONS VIOLATES DEFENDANTS' DUE PROCESS RIGHTS............................................................................15

CONCLUSION......................................................................................................... 17

# TABLE OF AUTHORITIES

**CASES**                                          **PAGE(S)**

*Aetna Life Ins. Co. v. Lavoie*,
106 S. Ct. 1580 (1986) ................................................................................................16

*Bear, Stearns Sec. Corp. v. Gredd*,
2001 WL 840187 (S.D.N.Y. July 25, 2001) ...................................................5, 6, 10

*In re Bernard L. Madoff Inv. Secs. LLC*,
No. 10-2378 (2d Cir.) .................................................................................................8

*Matter of Bevill, Breslet & Schulman, Inc.*,
94 B.R. 817 (D.N.J 1989) ...........................................................................................9

*In re Cablevision S.A.*,
315 B.R. 818 (S.D.N.Y. 2004) ....................................................................................5

*Caperton v. A.T. Massey Coal Co., Inc.*,
129 S. Ct. 2252 (2009) .........................................................................................15, 17

*City of New York v. Exxon Corp.*,
932 F.2d 1020 (2d Cir. 1991) ......................................................................................4

*In re Contemporary Lithographers, Inc.*,
127 B.R. 122 (M.D.N.C. 1991) ..................................................................................10

*Eastern Airlines, Inc.* v. *Air Line Pilots Ass'n (In re Ionosphere Clubs, Inc.)*,
1990 WL 5203 (S.D.N.Y. Jan. 24, 1990) ...................................................................4

*In re Enron Corp.*,
388 B.R. 131 (S.D.N.Y. 2008) ....................................................................................5

*Enron Power Mktg., Inc.* v. *Cal. Power Exch. Corp. (In re Enron Corp.)*,
2004 WL 2711101 (S.D.N.Y. Nov. 23, 2004) ........................................................4, 5

*Grippo v. Perazzo*,
357 F.3d 1218 (11th Cir. 2004) ................................................................................12

*In re Madoff*,
No. 08-01789 ............................................................................................................13

*In re McCrory Corp.*,
160 B.R. 502 (S.D.N.Y. 1993) ....................................................................................4

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
    547 U.S. 71 (2006)............................................................................................................12

*Nathel v. Siegal*,
    592 F. Supp. 2d 452 (S.D.N.Y. 2008)..............................................................................12

*In re New Times Sec. Servs., Inc.*,
    371 F.3d 68 (2d Cir. 2004)................................................................................................13

*Picard v. HSBC Bank PLC*,
    2011 WL 1544494 (S.D.N.Y. April 25, 2011) ...............................................................4, 5

*Picard v. JPMorgan Chase & Co., et. al.*,
    11 Civ. 0913, Slip Op. at 14..............................................................................................5

*SEC v. Zandford*,
    535 U.S. 813 (2002)..........................................................................................................12

*In re Sharp International Corp.*,
    403 F.3d 43 (2d Cir. 2005)............................................................................................2, 14

*Shugrue v. Air Line Pilots Ass'n, Int'l (In re Ionosphere Clubs, Inc.)*,
    922 F.2d 984 (2d Cir. 1990)..........................................................................................4, 5

*Trefny v. Bear Stearns Securities Corp.*,
    243 B.R. 300 (S.D. Tex. 1999).........................................................................................9

*Tumey v. State of Ohio*,
    47 S. Ct. 437 (1927).........................................................................................................16

*Ultramar Energy Ltd. v. Chase Manhattan Bank, N.A.*,
    191 A.D.2d 86 (1st Dep't 1993) ...................................................................................2, 14

*Withrow v. Larkin*,
    95 S. Ct. 1456 (1975).......................................................................................................16

**STATUTES & RULES**

59 Fed. Reg. 59612, 59613 (Nov. 17, 1994) (to be codified at 17 C.F.R. pt. 240) ......................10

17 C.F.R. §240.10B-10 (2010) ......................................................................................................10

17 C.F.R. §300.500 ........................................................................................................................13

17 C.F.R. §300.502 ........................................................................................................................13

59 Fed. Reg. 59612, 59614 ............................................................................................................11

11 U.S.C. SECTIONS 544, 547 AND 548 .....................................................................................2

15 U.S.C. § 78FFF-2(C)(3)...............................................................................................2, 6, 9, 13

28 U.S.C. § 157(d) .................................................................................................1, 4, 5

Section 550(a)(1) of Bankruptcy Code ........................................................................5

Article 8 of the New York Uniform Commercial Code ("NYUCC") ...................11, 12

NYUCC § 8-102(a)(14)(ii) ........................................................................................11

NYUCC § 8-102(a)(17) .............................................................................................11

NYUCC § 8-102(a)(9)(i) ...........................................................................................11

NYUCC § 8-501(b) ...................................................................................................11

NYUCC § 8-501 cmt. 2 .............................................................................................12

NYUCC § 8-501 cmt. 3 .............................................................................................12

NYUCC § 8-501 *et seq.* Article 8 .............................................................................11

NYUCC § 8-503 cmt. 2 .............................................................................................11

Rule 10b-5 .................................................................................................................12

Rule 10b-10 under the Securities Exchange Act of 1934 ...........................................10

Rule 409 ....................................................................................................................11

Rule 2340 ..................................................................................................................11

## INTRODUCTION

The Defendants respectfully submit this memorandum of law in support of their motion, pursuant to 28 U.S.C. § 157(d), for mandatory withdrawal from the bankruptcy court of the "clawback" actions brought against them by Irving H. Picard, Trustee for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") pursuant to the Securities Investor Protection Act ("SIPA"). Significant and novel questions of first impression under the securities laws and under the United States Constitution mandate the withdrawal of the reference pursuant to 28 U.S.C. § 157(d) ("The district court shall . . . withdraw a proceeding if . . . resolution of the proceeding requires consideration of both Title 11 and other laws of the United States[.]"). [2]

## PRELIMINARY STATEMENT

The Trustee has sued the Defendants in substantially identical actions to recover withdrawals that they took in the ordinary course of their investment affairs from their BLMIS accounts. *See* Chaitman Declaration at ¶1. As set forth in the Chaitman Declaration, the complaints against the Defendants were filed in December 2010 but summonses were not issued and the complaints were not served, in many instances, until several months thereafter. *Id.* With respect to all of the Defendants, their time to answer the complaints filed against them has been extended by the Trustee and has not yet expired. *Id.* The Defendants intend to move to dismiss the complaints on numerous grounds that are based upon the federal and state securities laws and upon the United States Constitution. *Id.*

---

[2] The undersigned counsel represents approximately 313 defendants in 108 separate clawback actions filed by Irving H. Picard, Trustee (the "Defendants"). The Defendants' names and the corresponding adversary proceeding numbers are fully set forth on Exhibit A to the June 2, 2011 Declaration of Helen Davis Chaitman submitted in support of this motion. Rather than file 313 separate motions to withdraw the reference in 108 different adversary proceedings, which would surely delay the determination of this motion and burden the Court's and the Clerk's staff, the Defendants have filed this single motion in the above-referenced adversary proceeding.

The Trustee has conceded that the Defendants were "innocent" investors; that is, that they had no knowledge that BLMIS was a fraud. *Id.* at ¶2. The Trustee's theory is that the Defendants withdrew from their BLMIS accounts, over a period extending as long as 50 years, more money than they, or their parents, or their grandparents, invested, and that they have a legal obligation to return to the Trustee the amount by which their withdrawals exceeded their investments. *Id.* The causes of action the Trustee has asserted against the Defendants are fraudulent transfer and preference claims, pursuant to the avoidance provisions of the Bankruptcy Code, 11 U.S.C. Sections 544, 547 and 548, and pursuant to New York Debtor and Creditor Law (the "clawback actions"). *Id.* at ¶3. However, the issue of whether the Trustee has the right to bring the clawback actions is subject to substantial dispute and requires resolution of issues of first impression (*id.)* including the following:

Under SIPA, a trustee has no power to utilize the avoidance provisions of the Bankruptcy Code unless and until the fund of customer property is insufficient to pay all allowed customer claims. *See* 15 U.S.C. § 78fff-2(c)(3). In the 2 ½ years since the Trustee was appointed by the Securities Investor Protection Corporation ("SIPC"), he has allowed claims of $6.8 billion. He is currently holding in the fund of customer property the sum of $9.8 billion. Thus, under the plain language of SIPA, the Trustee has no authority to sue the Defendants.

BLMIS was an SEC-regulated broker/dealer and a member of SIPC. Under applicable provisions of federal and state securities laws, a broker owes his customer the balance shown on the customer's statement. Thus, the customer's balance is a debt of the broker to the customer and a withdrawal by the customer simply reduces the broker's debt to the customer. As the Second Circuit has held, the payment of an antecedent debt cannot be a fraudulent transfer under the Bankruptcy Code. *See In re Sharp International Corp.*, 403 F.3d 43, 54 (2d Cir. 2005) (quoting *Ultramar Energy Ltd. v. Chase Manhattan Bank, N.A.*, 191 A.D.2d 86, 90-91 (1st Dep't

1993)) (holding that a "'conveyance which satisfies an antecedent debt made while the debtor is insolvent is neither fraudulent nor otherwise improper, even if its effect is to prefer one creditor over another.'").

The Trustee has taken positions in the BLMIS case which substantially deprive the Defendants of the protections of SIPA and he has been given authority to do so by the Securities and Exchange Commission (the "SEC") and by SIPC. In fact, his actions have been deemed a violation of state and federal laws by Congressman Scott Garrett, the Chairman of the Subcommittee on Capital Markets, Insurance, and Government-Sponsored Enterprises, of the Financial Services Committee (the "Subcommittee") of the House of Representatives. The Subcommittee has direct supervision over SIPC. Congressman Garrett made the following statement when he introduced legislation on December 17, 2010 intended to enforce SIPA against the Trustee:

> I am concerned that the trustee in the Madoff case is ignoring this law and failing to provide prompt assistance to those who have been thrust into financial chaos. He is taking positions on a wide range of issues that are contrary to the Securities Investor Protection Act, the Bankruptcy Code, and federal and state laws that are intended to protect investors against bad acts on the part of their brokers. This legislation is intended to clarify for the trustee and the Bankruptcy Court that Congress wants these laws to be followed.

States News Service (12/17/10) annexed to the Chaitman Declaration as Exh. B.

In addition, the Department of Justice has authorized the Trustee to distribute to customers with allowed claims funds that have been forfeited by certain of the criminal co-conspirators of Bernard L. Madoff. In view of these functions, the Trustee is acting in a quasi-governmental capacity. Yet, the Trustee has conceded that he receives as compensation from his law firm, Baker & Hostetler LLP ("B&H"), a percentage of the fees paid by SIPC to B&H which, to date, exceed $180 million. (6/1/11 Tr. of argument before Judge Lifland on B&H's

sixth interim fee application).[3]  It is a violation of the Defendants' constitutional rights for the

Trustee's compensation to be substantially enhanced as a result of the positions he has taken in

his official capacity.

## ARGUMENT

### I.    WITHDRAWAL OF THE REFERENCE IS MANDATORY

Withdrawal of the reference from a bankruptcy court is governed by 28 U.S.C. § 157(d)

which provides, in relevant part:

> The district court shall, on timely motion of a party, so withdraw a
> proceeding if the court determines that resolution of the proceeding
> requires consideration of both title 11 and other laws of the United
> States regulating organizations or activities affecting interstate
> commerce.

Pursuant to section 157(d), withdrawal of the reference is mandatory in any proceeding

that involves ''significant interpretation, as opposed to simple application, of federal laws apart

from the bankruptcy statutes.'"  *Picard v. HSBC Bank PLC*, 2011 WL 1544494, at *2 (S.D.N.Y.

April 25, 2011) (citing *City of New York v. Exxon Corp.*, 932 F.2d 1020, 1026 (2d Cir. 1991));

*accord Shugrue v. Air Line Pilots Ass'n, Int'l (In re Ionosphere Clubs, Inc.)*, 922 F.2d 984, 995

(2d Cir. 1990) (requiring "substantial and material consideration" of federal non-bankruptcy

law).  The purpose of §157(d) is to assure that an Article III judge decides issues calling for more

than routine application of [federal laws] outside the Bankruptcy Code.'"  *Enron Power Mktg., Inc.*

v. *Cal. Power Exch. Corp. (In re Enron Corp.),* 2004 WL 2711101, at *2 (S.D.N.Y. Nov. 23, 2004)

(quoting *Eastern Airlines, Inc.* v. *Air Line Pilots Ass'n (In re Ionosphere Clubs, Inc.)*, 1990 WL

5203, at *5 (S.D.N.Y. Jan. 24, 1990)).  Issues of non-bankruptcy law raised in the proceeding

need not be "unsettled."  *In re McCrory Corp.*, 160 B.R. 502, 505 (S.D.N.Y. 1993).  Rather, it is

adequate if the claims asserted merely involve "substantial and material" issues under non-

---

[3] The transcript will be supplied to the Court immediately upon receipt by Defendants' counsel.

bankruptcy law. *In re Enron*, 2004 WL 2711101 at *2 (*quoting Shugrue v. Air Line Pilots Ass'n Int'l* (*In reIonosphere Clubs, Inc.*), 922 F.2d at 995).

Because SIPA is codified under Title 15 as a securities law, a "substantial issue under SIPA is therefore, almost by definition, an issue 'the resolution of [which] requires consideration of both Title 11 and other laws of the United States.'" *HSBC Bank PLC*, 2011 WL 1544494 at *2 (quoting 28 U.S.C. § 157(d); *see also Picard v. JPMorgan Chase & Co.*, *et. al.*, 11 Civ. 0913, Slip Op. at 14 ("[A]n issue that requires significant interpretation of SIPA undoubtedly requires consideration of laws other than Title 11. Regardless of a bankruptcy court's familiarity with a statute outside of Title 11, the requirements for mandatory withdrawal are satisfied if the proceeding requires consideration of a law outside of Title 11.").

Courts in this District have routinely withdrawn the reference where significant interpretation of the securities laws has been required. *See, e.g.*, *Bear, Stearns Sec. Corp. v. Gredd*, 2001 WL 840187, at *4 (S.D.N.Y. July 25, 2001) (withdrawal mandatory where SEC rule potentially precluded application of Bankruptcy Code avoidance provisions because debtor would not have interest in subject property); *In re Cablevision S.A.*, 315 B.R. 818, 821 (S.D.N.Y. 2004) (withdrawal mandatory where interplay between federal securities laws and ancillary proceeding section of Bankruptcy Code was required); *In re Enron Corp.*, 388 B.R. 131, 140 (S.D.N.Y. 2008) (withdrawal mandatory where trustee's theory of secondary liability under Section 550(a)(1) of Bankruptcy Code, if it were reached, involved substantial and material consideration of Securities Act).

Withdrawal is also mandatory where there appears to be a conflict between the Bankruptcy Code and other federal laws. *See HSBC Bank PLC*, 2011 WL 1544494 at *4 (deeming a conflict between SIPA and bankruptcy law as "something that itself warrants withdrawal of the bankruptcy reference"); *see also In re Cablevision*, 315 B.R. at 821 ("The very

existence of a dispute as to whether the rights of [investors] under the [Trust Indenture Act] and Williams Act supersede Section 304 [of the Bankruptcy Code] or whether the Bankruptcy Code overrides the TIA, regardless of the ultimate resolution of such dispute, mandates withdrawal."); *Gredd*, 2001 WL 840187, at *2-4 (withdrawing reference where federal securities laws "arguably conflict[ed]" with the Bankruptcy Code).

The Trustee's actions against the Defendants mandate the withdrawal of the reference because the clawback complaints are based upon the Trustee's unprecedented interpretation of SIPA and the Trustee's disregard of applicable state and federal securities laws. The Defendants' motions to dismiss will include the following arguments:

### A. THE CLAWBACK COMPLAINTS VIOLATE SIPA § 78FFF-2(C)(3)

The Trustee has violated SIPA – and caused untold devastation to thousands of innocent investors whose lives were decimated by Madoff's fraud -- by utilizing the avoidance provisions of the Bankruptcy Code to sue approximately 5,000 innocent investors despite the fact that he is holding sufficient money in the fund of customer property to pay all allowed customer claims, inclusive of the SIPC advances. Under § 78fff-2(c)(3), a SIPA trustee has the power to use the avoidance provisions of the Bankruptcy Code to recover property **only** when there are insufficient funds in the estate to pay allowed customer claims and reimburse SIPC for the amounts paid in SIPC insurance:

> **Whenever customer property is not sufficient to pay in full the claims set forth in subparagraphs (A) through (D) of paragraph (1)**, the trustee may recover any property transferred by the debtor which, except for such transfer, would have been customer property if and to the extent that such transfer is voidable or void under the provisions of Title 11. (Emphasis added.)

In instituting 988 clawback actions against innocent investors, the Trustee relies for his statutory authority on SIPA Section 78fff-2(c)(3). In each complaint, he makes the following allegation:

> . . . the Trustee must use his authority under SIPA and the Bankruptcy Code to pursue recovery from customers who received preferences and/or payouts of fictitious profits to the detriment of other defrauded customers whose money was consumed by the Ponzi scheme. **Absent this or other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA section 78fff-2(c)(1).**

*See e.g.*, *Picard v. Shapiro Nominee, et. al.*, Doc. #1, Adv. Pro. No. 10-4328 (the "Shapiro Nominee Clawback Complaint"), at ¶17 (emphasis added). A copy of this complaint is annexed to the Chaitman Declaration as Exhibit C.

Section 78fff-2(c)(1)(A) – (D) sets forth the claims that must be satisfied from the fund of customer property. If the fund of customer property is sufficient to satisfy the following claims, then the Trustee has no power to institute avoidance actions:

> **(A)** first, to SIPC in repayment of advances made by SIPC pursuant to <u>section 78fff-3(c)(1)</u> of this title, to the extent such advances recovered securities which were apportioned to customer property pursuant to <u>section 78fff(d)</u> of this title;

> **(B)** second, to customers of such debtor, who shall share ratably in such customer property on the basis and to the extent of their respective net equities;

> **(C)** third, to SIPC as subrogee for the claims of customers;

> **(D)** fourth, to SIPC in repayment of advances made by SIPC pursuant to <u>section 78fff-3(c)(2)</u> of this title.

The Trustee has acknowledged that only the second and third priorities of distribution are applicable in this case, *i.e.*, categories "B" and "C." *See* Motion for an Order Approving Initial Allocation of Property to the Fund of Customer Property and Authorizing an Interim Distribution to Customers (the "Interim Distribution Motion"), Doc. # 4048, Case No. 08-01789 (Bankr. S.D.N.Y.), at ¶38, attached as Exh. D to the Chaitman Declaration.

As of May 23, 2011, the Trustee had determined 99.97% of all customer claims. He has allowed claims totaling $6,883,791,021 on which SIPC has advanced a total of $794,890,347. <u>http://www.madofftrustee. com/Status.aspx</u>; *see also* Cohen Aff., Ex. A, Interim Distribution Motion ¶7, annexed to the Chaitman Declaration as Exh. E. Thus, if the Trustee had

$6,883,791,021 in the fund of customer property, he could not use the avoidance provisions of the Bankruptcy Code.[4]

The fund of customer property now consists of more than $9.8 billion. The Trustee states that the fund of customer property totals $7.6 billion. *See* Interim Distribution Motion, Chaitman Exh. D at ¶6. In his calculation, however, the Trustee does not include $2.2 billion forfeited to the government by the Picower Parties, even though he previously represented that "every penny" of the $7.2 billion settlement with the Picower Parties would be distributed to customers. *See* Chaitman Declaration Press Release of Irving H. Picard, "$7.2 BILLION RECOVERY AGREEMENT WITH ESTATE OF JEFFRY PICOWER AND PICOWER-RELATED INVESTORS," dated December 17, 2010, at 1, annexed to the Chaitman Declaration as Exh. F. Thus, the Trustee has $9.8 billion in the fund of customer property and he has allowed claims of less than $6.9 billion, leaving an excess of $2.9 billion. To summarize:

---

[4] With the support of the SEC and SIPC, the Trustee has taken the position, for the first time in SIPA's history, that a customer's claim is allowable only for the customer's net investment over the life of the account, through generations. The bankruptcy court has sustained the Trustee's interpretation of "net equity" and that issue was directly certified to the Second Circuit and argued on March 3, 2011. *See In re Bernard L. Madoff Inv. Secs. LLC*, No. 10-2378 (2d Cir.). If the Second Circuit reverses, the allowed customer claims will increase substantially. However, if the Second Circuit holds that each customer's "net equity" is his final account balance, that would provide another basis for barring the clawback actions.

| Fund of Customer property | | Allowed Customer Claims | |
|---|---|---|---|
| **Description** | **Amount** | **Payee** | **Amount** |
| Recoveries as of 9/30/2010 | $1,500,000,000 | BLMIS Customers' Net Equity Claims | $6,088,900,674 |
| Picower Family Settlement | $5,000,000,000 | SIPC's Subrogee Claim | $794,890,347 |
| Picower forfeiture to US | $2,200,000,000 | | |
| Shapiro Family Settlement | $550,000,000 | | |
| Union Bancaire Privee Settlement | $470,000,000 | | |
| Hadassah Settlement | $45,000,000 | | |
| Other Preference Settlements | $89,071,011 | | |
| **Fund of Customer Property:** | **$9,854,071,011** | **Customer Claims:** | **$6,883,791,021** |

Since SIPA § 78fff-2(c)(3) only authorizes a trustee to utilize the avoidance provisions of the Bankruptcy Code when the fund of customer property is insufficient to pay the allowed customer claims, the Trustee is acting in direct contravention of SIPA by proceeding with the clawback suits.  *See Trefny v. Bear Stearns Securities Corp*., 243 B.R. 300, 321 (S.D. Tex. 1999) ("Section 78fff-2(c)(3) comes into effect when the customer's property held by the debtor is not sufficient to pay customers' claims in full."); *Matter of Bevill, Breslet & Schulman, Inc.*, 94 B.R. 817, 824 (D.N.J 1989) (citing 15 U.S.C. § 78fff-2(c)(3)) ("[A] trustee's avoidance power under section 78fff-2(c)(3) of SIPA only comes into effect '[w]henever customer property is not sufficient to pay in full [certain creditor's claims].")  And, of course, he is causing absolute devastation among clawback defendants by doing so.

The Trustee's self-serving explanation that he **may** in the future allow additional claims does not change the fact that his prosecution of  988 clawback suits against innocent investors is *ultra vires* and unlawful.  Therefore, the Trustee's position that he is permitted to use the

avoidance power even when he has sufficient money to pay all allowed claims is a stunning and unprecedented interpretation of SIPA that requires withdrawal of the reference. [5]

## B.   THE COMPLAINTS VIOLATE OTHER SECURITIES LAWS

As Congressman Garrett recognizes, the Trustee's unprecedented interpretation of SIPA conflicts with state and federal securities laws and regulations.  SEC regulations have the force of law and cases that involve substantial consideration of such regulations also require withdrawal of the reference to the bankruptcy court.  *See, e.g.*, *Bear, Stearns Sec. Corp.*, 2001 WL 840187 at *4 (withdrawing reference because Trustee's fraudulent transfer theory required "substantial and material consideration" of federal securities regulations); *In re Contemporary Lithographers, Inc.*, 127 B.R. 122, 123 (M.D.N.C. 1991) (granting motion to withdraw reference because case required interpretation of SEC regulations).

The Defendants were customers of an SEC-regulated broker/dealer who owed them the balances shown on their statements.  Because investment securities today are held in electronic form, customers have no evidence of their ownership of securities other than the statements they receive from their brokers.  Rule 10b-10 under the Securities Exchange Act of 1934 requires brokers to provide customers with confirmations of securities transactions.  *See* Rule 10b-10, 17 C.F.R. §240.10B-10 (2010) (Confirmation of Transactions).  The SEC releases adopting this rule provide that broker confirmations are legally enforceable evidence of a broker's obligation to the customer.  *See, e.g.,* Confirmation of Transactions, 59 Fed. Reg. 59612, 59613 (Nov. 17, 1994) (to be codified at 17 C.F.R. pt. 240) ("For over 50 years, the customer confirmation has served basic investor protection functions by conveying information allowing investors to verify the

---

[5] We recognize that the Trustee had a statute of limitations of December 11, 2010 to file the clawback actions.  However, he could have sought an extension of the statute of limitations from the bankruptcy court pending the Second Circuit's decision on "net equity" and filed complaints only against any investors who objected to that motion.  Alternatively, he could have filed the clawback actions and stayed them pending the Second Circuit's decision.

terms of their transactions; alerting investors to potential conflicts of interest with their broker-dealers; acting as a safeguard against fraud; and providing investors the means to evaluate the costs of their transactions and the quality of their broker-dealer's execution.").

The rules of FINRA and the NYSE similarly mandate issuance of periodic account statements. *See* NASD Rule 2340 (Customer Account Statements); NYSE Rule 409 (Statements of Accounts to Customers). Because statements are so critical, where customers have given their broker trading authority, the SEC prohibits waiver of the right to receive such statements. *See* Confirmation of Transactions, 59 Fed. Reg. 59612, 59614 ("The customer may not waive this periodic report.").

Article 8 of the New York Uniform Commercial Code ("NYUCC") determines the customer's rights against his broker. *See* NYUCC § 8-501 *et seq.* Article 8 also addresses the modern electronic securities holding system, in which customers do not hold physical certificates. *See* NYUCC Art. 8 Historical and Statutory Notes ("Legislative Intent and Declaration") (McKinney 2002). Under Article 8, the broker's obligation to the customer is created by the issuance of a statement. The NYUCC provides that "a person acquires a security entitlement[6] if a securities intermediary[7] . . . (1) indicates by book entry that a financial asset has been credited to the person's securities account . . . [or] (3) becomes obligated under other law, regulation, or rule to credit a financial asset to the person's securities account." NYUCC § 8-501(b). It is therefore "a basic operating assumption of the indirect holding system that once a

---

[6] A "security entitlement" means "the rights and property interest of an entitlement holder with respect to a financial asset [including a security, *see* NYUCC § 8-102(a)(9)(i)] specified in Part 5 [of Article 8]." NYUCC § 8-102(a)(17). It is "a package of rights and interests that a person has against the person's securities intermediary and the property held by the intermediary." NYUCC § 8-503 cmt. 2.

[7] A "securities intermediary" includes a broker. *See* NYUCC § 8-102(a)(14)(ii).

[broker] has acknowledged that it is carrying a position in a financial asset for its customer . . . the [broker] is obligated to treat the customer . . .as entitled to the financial asset." NYUCC § 8-501 cmt. 2.

Under Article 8, the issuance of a statement to a customer entitles that customer to the securities shown on the statement, even if the broker doesn't own the securities. Once ownership is acknowledged, Section 8-501(c) provides that "a person has a security entitlement even though the securities intermediary does not itself hold the financial asset"—i.e., the broker owes the customer the securities reflected on the customer's statement regardless of whether the broker actually purchased the securities. As the Official Comment to this Section explains:

> In the indirect holding system, the significant fact is that the securities intermediary has undertaken to treat the customer as entitled to the financial asset. It is up to the securities intermediary to take the necessary steps to ensure that it will be able to perform its undertaking.
>
> * * *
>
> The entitlement holder's rights against the securities intermediary do not depend on whether or when the securities intermediary acquired its interests.

NYUCC § 8-501 cmt. 3.

Similarly, the federal securities laws enforce the customer's right to the securities on his statement whether or not a broker actually purchased the securities in view of the fact that the customer has no ability to confirm the transaction. The customer is protected when the broker accepts the customer's payment and issues a statement that acknowledges its debt to the customer. "[A] broker who accepts payment for securities that he never intends to deliver . . . violates § 10(b) and Rule 10b-5." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 n.10 (2006); *SEC v. Zandford*, 535 U.S. 813, 819 (2002) (same); *see also Grippo v. Perazzo*, 357 F.3d 1218, 1223-24 (11th Cir. 2004) (finding "in connection with" the purchase or sale of a security element of securities fraud claim adequately pled where broker accepted and deposited customer's money as payment for securities); *Nathel v. Siegal*, 592 F. Supp. 2d 452,

464 (S.D.N.Y. 2008) (deeming allegations that broker falsely promised to purchase securities, but never intended to do so sufficient to allege fraud "in connection with" a purchase of securities). Were the law otherwise, the protective legal framework that promotes investment through registered brokers would be rendered entirely illusory.

SIPA was enacted in 1970 to instill confidence in the capital markets by protecting investor expectations. Customers were induced to relinquish the protections of holding certificated securities in exchange for the promise of SIPC insurance (a promise broken by the Trustee and SIPC in the BLMIS case, remarkably with the SEC's blessing). Thus, for example, SIPC's Series 500 Rules, 17 C.F.R. §300.500, provide for the classification of claims in accordance with the "legitimate expectations" of a customer based upon the written confirmations sent by the broker-dealer to the customer. *See* 17 C.F.R. §300.502. Indeed, SIPC expressly advised customers that "[i]n the unlikely event your brokerage firm fails, you will need to prove that cash and/or securities are owed to you. This is easily done with a copy of your most recent statement and transaction records of the items bought or sold after the statement." SIPC, SIFMA, and NASAA, *Understanding Your Brokerage Account Statements*, at 5 (Chaitman Declaration Exh. G; *see also In re New Times Sec. Servs., Inc.*, 371 F.3d 68, 86 (2d Cir. 2004) (customer in SIPA case is entitled to rely "on what the customer has been told by the debtor in written confirmations").

The Trustee and SIPC do not disagree that customers are creditors. Nor could they. SIPA itself so states, *see* 15 U.S.C. § 78fff-2(c)(3). The Trustee, too, has acknowledged that "[a]ll BLMIS customers who filed claims—whether their net equity customer claims were allowed or denied—are general creditors of the BLMIS estate." Trustee's Fifth Interim Report ¶ 76, *In re Madoff*, No. 08-01789, doc. no. 4072 (Bankr. S.D.N.Y. May 16, 2011). Having acknowledged that the Defendants are valid creditors of BLMIS, the Trustee is barred from suing

them to recover withdrawals they took from their accounts which reduced BLMIS' indebtedness to them.

Thus, Defendants indisputably have a claim against BLMIS for the balance on their account statements. The transfers that they received over the course of their investments reduced their account balances in partial satisfaction of the debt owed to them. Thus, the payments made by BLMIS were made on account of antecedent debt and are not avoidable by the Trustee. *See In re Sharp International Corp.*, 403 F.3d at 54 (quoting *Ultramar Energy Ltd.*, 191 A.D.2d at 90-91) (holding that a "'conveyance which satisfies an antecedent debt made while the debtor is insolvent is neither fraudulent nor otherwise improper, even if its effect is to prefer one creditor over another.'").

The Trustee has taken the position that he is not bound by the account statements because Madoff was allegedly operating a Ponzi scheme. Thus, the Trustee contends that he is not bound by state and federal laws protecting securities customers. *See, e.g.,* Trustee's Memorandum of Law in Opposition to the Sterling Defendants' Motion to Dismiss, or, in the Alternative, for Summary Judgment (the "Trustee's Opp.") in *Picard v. Katz*, Adv. Pro. No. 10-05287 (BRL), dated May 19, 2011, annexed as Exh. H to the Chaitman Declaration (contending that customer statements do not reflect valid antecedent debt). This argument is made not only as to the last statements received by the defrauded customers, but as to all statements they received over the last 50 years!

The Trustee claims – without any legal authority – that he has an obligation to sue thousands of investors in 988 separate actions because these investors (or their forbears) took out more money than they invested – over a period of up to 50 years. In a self-serving argument, the Trustee claims that "whether an investor is a customer under SIPA has no bearing upon whether

he received avoidable transfers from the broker-dealer." Trustee's Opp., Chaitman Declaration Exh. H at 69.[8]

The Trustee's position raises issues of first impression under the securities laws that mandate withdrawal of the reference.

### C. THE TRUSTEE'S FINANCIAL STAKE IN HIS QUASI-GOVERNMENTAL DECISIONS VIOLATES DEFENDANTS' DUE PROCESS RIGHTS

The Trustee affirmatively led the public to believe that he has not personally received as compensation even the Trustee's fees of $4,266,085.50 paid to B&H since his appointment. At the hearing on his first fee application, the Trustee stated as follows:

> As noted at paragraph 33 of my application and contrary to the implication of certain objections that have been filed with the Court and before the press, the amounts that will be rewarded either today or at another time are going to be turned over to Baker Hostetler, the firm of which I am a partner. I want to emphasize I will not retain any portion of the award.

(8/6/09 Hrg. Trans. 14:15-21, annexed as Exh. I to the Chaitman Declaration.)

However, on June 1, 2011, the Trustee finally admitted in open court that he is compensated in the amount of a percentage of the fees paid to B&H by SIPC, although he did not disclose the percentage he is paid. (6/1/11 Tr. to be supplied upon request.) Thus, the Trustee has personally enriched himself by taking the unprecedented position that he has the statutory authority to sue thousands of innocent Madoff victims in 988 separate adversary proceedings at a cost to SIPC of tens of millions of dollars.

The Trustee's financial interest in his official functions constitutes a violation of the Defendants' right to due process of law. *See Caperton v. A.T. Massey Coal Co., Inc.*, 129 S. Ct. 2252 (2009) (litigant's due process rights are violated where judge accepted $3 million

---

[8] If the Trustee prevailed in his 988 clawback actions against innocent investors, he would allegedly recover $4.6 billion, which would entitle the defendants to tax refunds equivalent to approximately 30% of that sum.

contribution to his election campaign from party litigant); *Withrow v. Larkin*, 95 S. Ct. 1456, 1464 (1975) (recognizing that due process concerns exist when "the probability of actual bias on the part of the . . . decisionmaker is too high to be constitutionally tolerable); *Tumey v. State of Ohio*, 47 S. Ct. 437 (1927) (holding that compensation structure under which mayor-judge received salary supplement only upon convicting defendant violated due process); *Aetna Life Ins. Co. v. Lavoie*, 106 S. Ct. 1580, 1587 (1986) (internal citations omitted) (emphasizing that proper inquiry is whether financial stake "would offer a possible temptation[,]" and not whether individual was actually influenced). This conflict of interest is exacerbated by the fact that the Trustee has argued, and the bankruptcy court has agreed, that the bankruptcy court has no authority to review the fees of B&H for reasonableness once SIPC approves them (which it has done throughout the SIPA liquidation). See 6/1/11 Tr. to be supplied to the court upon receipt. Thus, SIPC, whose members have been enriched by the Trustee's violations of SIPA, can control the Trustee's compensation and that of his law firm.

As the "decision-maker" for SIPC, a quasi-governmental agency, in this liquidation proceeding in which SIPC has taken unprecedented positions under SIPA, the Trustee is acting in a quasi-governmental capacity. *See* March 10, 2011 Testimony of SEC Chairwoman Mary Shapiro before the House Committee on Oversight and Government Reform (testifying that the Trustee and not the SEC makes the decision to clawback from innocent investors) annexed as Exh. J to the Chaitman Declaration; *see also* Carlyn Kolker and Christopher Scinta, "Madoff Trustee Picard May Take Five Years to Pay Back Investors" dated January 21, 2009, available at Bloomberg.com, at 1 (quoting SIPC's President Stephen Harbeck identifying the Trustee as the decision-maker.)

Moreover, the Department of Justice has appointed Mr. Picard as a special master to distribute funds forfeited to the United States by Madoff co-conspirators Carl Shapiro and the

Picower Parties. In a press release dated December 17, 2010 issued by the Government, it was stated as follows:

> The United States Attorney's Office will use funds forfeited in the settlement announced today to compensate victims of Madoff's fraud. Last week, in connection with a $625 million settlement involving the Office, the SIPA Trustee, and Carl Shapiro and his family, Mr. Bharara announced that the Department of Justice had appointed Irving H. Picard as Special Master to oversee the process of remission or mitigation under the forfeiture laws.

*See* United States Department of Justice, Southern District of New York Press Release, "Manhattan U.S. Attorney Announces Agreement to Recover $7.2 Billion for Victims of Bernard L. Madoff's Ponzi Scheme from Estate of Jeffry M. Picower," at 4, annexed as Exh. K to Chaitman Declaration.

As a quasi-governmental figure, Mr. Picard is not "'allowed to be a judge in his own cause because his interest would certainly bias his judgment and, not improbably, corrupt his integrity.'" *Caperton*, 129 S. Ct. at 2259 (quoting The Federalist No. 10, p. 59 (J. Cooke ed. 1961) (J. Madison)). Constitutional due process violations implicated as a result of the Trustee's percentage interest in the fees paid to B&H by SIPC require substantial and material interpretation of federal law and mandate withdrawal of the reference.

## CONCLUSION

For the reasons stated herein, Defendants respectfully request that the Court withdraw the reference of their adversary proceedings for all purposes.

Dated: June 2, 2011                       **BECKER & POLIAKOFF LLP**

                                  By: <u>/s/ Helen Davis Chaitman</u>
                                     Helen Davis Chaitman
                                     45 Broadway
                                     New York, NY 10006
                                     (212) 599-3322
                                     *Attorneys for Defendants Listed on Exhibit A to the Chaitman Declaration*